IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

Gabriel J. Sosa
Plaintiff,

V.

THE CITY OF MIAMI,
Defendant.

_____/



FILED BY _____ D.C.

MAR 1 ~ 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS

### PARTIES

1. Plaintiff Gabriel J. Sosa  d/b/a:  SoBe Jetski Rental LLC. , Miami Marine Construction Corp., Watersport USA LLC., and Isle Water Taxi Corp.
2. Defendant City of Miami is a municipality in Miami-Dade County, Florida, organized under the laws of the State of Florida, and is therefore, subject to this Court's jurisdiction. The City is a local government entity subject to suit under 42 U.S.C. § 1983.

### JURISDICTION, VENUE & APPLICABLE LAW

3. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.
4. Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.
5. All conditions precedent to bringing this action have been performed or waived.

### STATEMENT OF FACTS

6. Approximately on 08/16/2016 the Plaintiff incorporated SoBe Jet Ski Rental, a limited liability company in the State of Florida. (See. Exhibit #01).,
7. Plaintiff operated the above mentioned legitimate and thriving jet ski business in the North Key Biscayne Bay Area and gained access to The bay from Watson Island Marina at 1099 MACARTHUR CAUSEWAY , MIAMI, FL 33132  (See. Exhibit #02)

8. Plaintiff's clients accessed The Bay in a similar and legitimate fashion as Duck Tours. (See. Exhibit #02 and Exhibit #02a)

9. Duck Tours South Beach is a company located at 1661 James Ave, Miami Beach, FL 33139

10. Duck Tours provides paying customers with tours that take place on purpose-built amphibious tour buses. That access The Bay by driving down the boat ramp, with clients on board, at Watson Island Marina. (See. Exhibit #03)

11. Plaintiff, SoBe Jet Ski Rental, provided paying customers with tours that take place on personal watercrafts (PWC) aka Jet Skis. That accessed The Bay by driving down the boat ramp with clients on board, on purpose-built Jet Skis and trailers in Watson Island Marina.  (See. Exhibit #02 and Exhibit #02a)

12. Approximately on 01/2017 the Plaintiff was intimidated by local law enforcement agencies for accessing The Bay for the above mentioned jet ski business at Watson Island Marina.

13. Thereafter, approximately on 02/07/2017 the Plaintiff became a silent partner and partial owner who removed his name from business documents, but was actively engaged in SoBe Jet Ski Rental daily operations, in fear of future legal retribution. (See. Exhibit #04)

14. Approximately on 05/10/2017 The City Of Miami police officers stated to the Plaintiff that having residents and tourist customers access The Bay at Watson Island Marina was illegal for the above mentioned jet ski business. (See. Exhibit #05)

15. Furthermore, The City of Miami police officers stated to the Plaintiff that The City Of Miami intentionally had a hold on the Plaintiff Business Tax Receipt (BTR). Thereby, it was illegal to conduct any business within The City Of Miami. (See. Exhibit #05)

16. Approximately on 05/24/2017 The City Of Miami had an informal meeting with department heads in the Miami Yacht Club at 1001 Macarthur Cswy, Miami, FL 33132. (See. Exhibit #06, Exhibit #07, and Exhibit #08)

17. The City Of Miami department heads included the following: City Of Attorneys Office., Director Of Code., Finance Manager., Parking Authority., Marine Patrol., Etc... (See. Exhibit #06, Exhibit #07, and Exhibit #08)

18. The purpose of the above mentioned informal meeting was to reiterate to the Plaintiff that having residents and tourist customers access The Bay at Watson Island Marina was illegal for the above mentioned jet ski business.Because, The City Of Miami intentionally and unlawfully had a hold on the Plaintiff Business Tax Receipt (BTR). Thereby, it was illegal to conduct any business within The City Of Miami and its abutting waters. (See. Exhibit #06, Exhibit #07, and Exhibit #08)

19. In addition, The City Of Miami Counsel added that it was illegal for the Plaintiff to even access The Bay for business purposes at Watson Island Marina. (See. Exhibit #06, Exhibit #07, and Exhibit #08)

20. On the above mentioned date. The above mentioned informal meeting concluded and the plaintiff was warned and not allowed access to The Bay for business purposes till further notice. (See. Exhibit #06, Exhibit #07, and Exhibit #08)

21. Despite the above mentioned meeting. Duck Tours was allowed to continue to have access to The Bay for business purposes. (See. Exhibit #09 and Exhibit #10)

22. Approximately on  02/27/2020 Plaintiff Incorporated, as a silent partner and partial owner, Miami Marine Construction Corp a for profit corporation in the State Of florida. (See. Exhibit #11)

23. The above mentioned company's purpose was any and all lawful business purposes.

24. Approximately on 07/2020 Plaintiff, by way of, Miami Marine Construction Corp entered into a private contract with Miramar Marina Corp aka Sea Isle Marina located at 1635 N Bayshore Dr, Miami, FL 33132. (See. Exhibit #12)

25. Plaintiff used the above mentioned contract in Sea Isle Marina for a jet ski rental business and boat charter purposes and to have clients, local residents and tourists, access The Bay.

26. Approximately on 03/18/2021 Plaintiff Incorporated, as a silent partner and partial owner, Watersport USA.  A limited liability company in the State Of florida. (See Exhibit #13)

27. The above mentioned company is a jet ski rental company.

28. Approximately on 04/06/2021 The City Of Miami raided Sea Isle Marina and intimidated the dock master with building code violations and influenced the dock master with their show of force to terminate the Plaintiff's above mentioned private contract.

29. Approximately on 05/19/2021 The Plaintiff Incorporated, as a silent partner and partial owner, Isle Water Taxi Corp a for profit corporation in the State Of florida. (See Exhibit #14)

30. The above mentioned company was going to be an environmental educational and public awareness water taxi providing access to The Bay. (See. Exhibit #15)

31. Isle Water Taxi Corp, was created to ensure equitable access to The Bay for all residents and visitors, and increasing opportunities for such access among those who most lack it.

32. Equitable access to The Bay means providing opportunities for people of varying abilities and across the full economic spectrum. (See. Exhibit #15)

33. Isle Water Taxi Corp had goals of creating a strong grassroot constituency for The Bay, by increasing the community's sense of stewardship of its resources and encouraging strong advocacy for its preservation. through broad-based communication and publications. (See. Exhibit #15)

34. Isle Water Taxi Corp had goals to develop an integrated system of transportation alternatives.(See. Exhibit #15)

35. The Bay offers a good opportunity for enhancing Miami-Dade's transportation networks and increasing Bay access for all residents and visitors. A coordinated approach to land and water transportation would have encompassed issues related to the use of boats, cars, buses and public transportation. (See. Exhibit #15)

36. Isle water Taxi Corp had a fundamental goal of the access plan which was based on efforts to provide broader public education on swimming, boating safety and overall community security. Because, safety on The Bay is integral to enjoyment and access. (See. Exhibit #15)

37. Approximately on 06/07/2021 Plaintiff applied with The City Of Miami for a Certificate Of Use and Business Tax Receipt Application #96633. (See. Exhibit #16 & Exhibit #17)

38. Approximately from 04/2021 through 08/2021 Plaintiff on **Tidal Navigable Waters,** would pick up paying clients of Watersport USA, on" The Bay" in the rear of Albert Pallot Park at 601NE 39th St Miami, Fl 33137  (See Exhibit #18 and Exhibit #19)

39. The above-mentioned park is a 3 acre park located two blocks east of Biscayne Boulevard at Northeast 38th Street and just north of the Julia Tuttle Causeway ramps. It is right on Biscayne Bay. As you cross over the causeway you can see the park's signature art piece, four 10-foot tall red and white dominoes in the shape of the letter M that memorializes developer, the late Jose Milton who loved to play dominoes.

40. Approximately on 06/07/21. Upon an observation from The City Of Miami Marine Patrol. Plaintiff was ordered to beach his personal watercraft on shore at the above mentioned park, along with his paying customers, and was subjected to an unconstitutional stop, an unconstitutional citation and given a misdemeanor charge, CaseNumber M-21011885, for an alleged violation of Sec. 50-157. - Public property abutting water; use restricted. (See Exhibit #20 and Exhibit #21)

41. Approximately on 06/14/2021 Isle Water Taxi Corp Application Number. CU-App-2584754 & Application Number. BTR-App-2584755 was received by The City Of Miami Office Of Zoning. (See. Exhibit #2222 & Exhibit #2323)

42. Approximately on 06/28/2021 a City Of Miami Zoning Information Specialist stated that upon reviewing Plaintiff's application, violations, BB2021003819; CE2021005519 were found for the building and has stopped his application process. (See. Exhibit #24)(See. Exhibit #24)

43. That the owner of the structure must contact the City of Miami Building Department at unsafestructure@miamigov.om  or  Raul Ramos by email at rramos@miamigov.com for details on how to resolve the violation and the Code Compliance Department at codecompliance@miamigov.com for details on how to resolve the violations on the property. (See. Exhibit #24) (See. Exhibit #24)

44. Approximately on 06/28/2021 Plaintiff made the following request to The City Of Miami Zoning Information Specialist. Can you please provide more details on the following violations. BB2021003819; CE2021005519. So that plaintiff may communicate and attempt to correct such violations with the building owner. (See. Exhibit #24) (See. Exhibit #24)

45. The following day the above mentioned specialist responded the following: Please contact the relative departments for the details. I do not have the authority to give details for violations issued by other departments. (See. Exhibit #24) (See. Exhibit #24)

46. Approximately on 06/29/2021 Plaintiff made the above mentioned request from paragraph 26 to the following departments: City of Miami Building Department at unsafestructure@miamigov.om .,  Raul Ramos by email at rramos@miamigov.com for details on how to resolve the violation and the Code Compliance Department at codecompliance@miamigov.com for details on how to resolve the violations on the property. (See. Exhibit #24) (See. Exhibit #24)

47. The above mentioned request has not been responded to by the above mentioned City Of Miami Departments. (See. Exhibit #24)

48. Approximately on 08/09/21 City Of Miami Marine Patrol. Interfered with plaintiff Watersport USA business, for no legitimate reason and with no lawful purpose, by harassing plaintiff's paying clients and illegally stopping their jet ski tour to have plaintiff provide commercial insurance documentation. (See. Exhibit #25, Exhibit #26, and Exhibit #27)

49. The City of Miami developed and deployed a deliberate policy and plan of action—devised by a City Commissioners; reified by legislative acts of the City Commission; cultivated and planned by the City Attorney and its office; implemented by all of the City's major administrative departments, including Building, Planning, Zoning, Fire, Police, Code Enforcement, and others; and effectuated through dozens of the City's professional staff and employees—to destroy Plaintiffs' fundamental and constitutionally protected rights to Plaintiff businesses.

50. Plaintiff operated legitimate and once-thriving businesses in the city of Miami. The City of Miami, with malicious intent, for no legitimate reason and with no lawful purpose, instituted its policy and then corrupted every organ of its municipal government in a relentless effort against Plaintiff designed to run him and his businesses out of town.

51. The City's vendetta against Plaintiff runs from top to bottom—its elected officials, lawyers, professional staff, and every single department within its administrative function. The City deliberately crafted a multi-pronged policy intended to unfold in stages and build relentlessly towards its eventual goal of destroying Plaintiffs businesses. To carry out its policy, the City weaponized the very tools of government designed to protect the health and safety of its citizens—abusing its code and code enforcement to deprive Plaintiffs of his fundamental business rights. To carry out its policy, the City in turn ignored and swept aside all procedural protections, even those required by both state statute and the City's own municipal laws. To carry out its policy, the City trapped Plaintiff in a nightmare runaround, issuing and then pulling entitlements, demanding actions and then moving the goalposts—for no legitimate purpose and with no end in sight. To carry out its policy, the City enforced one unconstitutional ordinance exclusively targeting Plaintiff. The City ultimately succeeded in shutting down all of Plaintiff's businesses. All of this, in the City's unyielding march to oust Plaintiff from his business rights.

52. This shameful conduct was recently corroborated by the Miami Police Chief's September 24, 2021 memorandum to the City's Manager and Mayor, wherein he details that City Commissioners used "improper political influence" and "intimidation" in order "to influence the [Miami Police Department] ("MPD") and City Code Enforcement deployment decisions;" and "provided the MPD with a target list of establishments . . . causing the MPD to investigate business establishments based on nothing more than the whims of [these] Commissioners." His statements mirrored those from almost two years ago when the prior Miami Police Chief likewise cautioned the City Manager that "the City Attorney is requesting that Miami police personnel, and other departments, conduct new site inspections at the direction of a City Commissioner...aimed at one particular business owner...to intentionally cause harm to [that] business owner" and

undertaking the "selective enforcement against the business owner's properties using city ordinances," which he described as "an unsanctioned and unlawful exercise of powers" in contravention of "the code of ethics" and "our charter."

53. This case is not "typical" Miami politics at play. It concerns small-minded politicians and corrupt administrators destroying the rights and property of private citizens because they refuse to kowtow to the right person or pay the right ask.

54. Business rights are fundamental to ordered liberty under the United States and Florida Constitutions. As the Supreme Court recently stated: "[T]he protection of property rights is necessary to preserve freedom and empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." Cedar Point v. Hassid, 141 S. Ct. 2063, 2071 (2021) (citations and quotations omitted). There is no doubt: "[p]roperty must be secure, or liberty cannot exist." Id. The prototype of these protections is to guard against arbitrary and capricious use of government power to take away rights solely predicated upon a vendetta. The City has turned the very idea of government on its head, abusing the very objectives of health, safety, and protection meant to protect its businesses and people, and taking advantage of that power for crass political gain.

55. Therefore, Plaintiff seek damages and equitable relief pursuant to 42 U.S.C. § 1983 and under the Federal and Florida Constitutions against the City of Miami for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of his fundamental rights, by: (1) violating Plaintiffs substantive and procedural due process rights through the deprivation of Plaintiffs rights as secured by the Fourteenth Amendment to the United States Constitution and the Florida Constitution; (2) depriving Plaintiff equal protection under the law by intentionally treating Plaintiff differently from others similarly situated (and having no rational basis for the disparate treatment); (3) violating Plaintiffs Fourth Amendment rights by conducting warrantless searches of Plaintiffs Personal WaterCraft (PWC) not in conformance with the purposes and procedures of any relevant statutory scheme; (4) violating the City Charter by not adhering to its own Code provisions, and (5) interfering with Plaintiffs business relations in violation of Florida law.

## 42 U.S.C. SECTION 1983 BACKGROUND

56. Section 1983 of 42 U.S.C. states as follows:

"Every person who, under color of any statute,   ordinance, regulation, custom, or usage, of any   State or Territory or the District of Columbia,   subjects, or causes to be subjected, any citizen of   the United States or other person within the   jurisdiction thereof to the deprivation of any      rights, privileges, or immunities secured by the   Constitution and laws, shall be liable to the party    injured in an action at law, Suit in equity, or    other proper proceeding for redress…"

57. 42 U.S.C. § 1983.  Section 1983 of the Civil Rights Act, does not, by its own terms, create any substantive rights.

58. Section 1983 only provides remedies for deprivation of rights established elsewhere in the Constitution for federal laws.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

59. To establish a claim pursuant to Section 1983, a plaintiff must "demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that alleged deprivation was committed by a person acting under the color of state law." Id.

60. To state a Section 1983 claim, the plaintiff is required to allege that (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived the plaintiff of a constitutional right.

## HISTORY OF SECTION 1983

61. Section 1983 was enacted on April 20, 1871 as part of the Civil Rights Act of 1871, and is also known as the "Ku Klux Klan Act" because one of its primary purposes was to provide a civil remedy against the abuses that were being committed in the southern states, especially by the Ku Klux Klan.

62. The Act was intended to provide a private remedy for such violations of federal law, and has subsequently been interpreted to create a type of tort liability.

63. The number of cases that have been brought under Section 1983 dramatically increased after  the Supreme Court's 1961 decision in Monroe v. Pape. In Monroe, the Supreme Court held that a police officer was acting "under color of state law" even though his actions violated state law. This was the first case in which the Supreme Court allowed liability to attach where a government official acted outside the scope of the authority granted to him by state law.

## ELEMENTS OF A 1983 CLAIM

64. According to the Third Circuit Jury Instructions, a Plaintiff must prove both of the following elements by a preponderance of the evidence:

65. Defendant acted under color of state law.

66. While acting under color of state law, the defendant deprived the plaintiff of a federal [constitutional right] [statutory right].

67. "Every person"

68. Only persons are subjected to 1983 liability.

69. A state is not a person, but a state officer can be sued in his personal capacity.

70. "Who under color of state law"

71. The traditional definition of acting under the color of state law requires that the defendant have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.  West v. Atkins, 487 U.S. 42, 49 (1988).

72. Such actions may result in liability even if the defendant abuses the position given to him by the state.

73. A private actor may also act under color of state law under certain circumstances. Wyatt v. Cole, 504 U.S. 158, 162 (1992);

74. A person can act under color of state law even if the act violates state law. The question is whether the person was clothed with the authority of the state, by either using or misusing the authority of the state.

75. "State law," means any statute, ordinance, regulation, custom or usage of any state. This includes any political subdivisions of the state, such as a county or municipality, and also any state, county or municipal agencies.

76. Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.

77. Liability under Section 1983 "attaches only to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'" National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191 (1988) (quoting Monroe v. Pape, 365 U.S. 167, 172 (1961)).

78. The inquiry into the question of action under color of state law "is fact-specific." In the usual case courts ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." Tarkanian, 488 U.S. at 192.

79. The Third Circuit has found such circumstances to include the following:

80. A finding of "a sufficiently close nexus between the state and the challenged action of the [private] entity so that the action of the latter may fairly be treated as that of the State itself."

81. A finding that "the State create[d] the legal framework governing the conduct."

82. A finding that the government "delegate[d] its authority to the private actor."

83. A finding that the government "knowingly accept[ed] the benefits derived from unconstitutional behavior."

84. A finding that "the private party has acted with the help of or in concert with state officials."

85. A finding that the action "result[ed] from the State's exercise of 'coercive power."

86. A finding that "the State provide[d] 'significant encouragement, either overt or covert.'"

87. A finding that "a nominally private entity . . . is controlled by an 'agency of the State.'"

88. A finding that "a nominally private entity . . . has been delegated a public function by the State."

89. A finding that "a nominally private entity . . . Is 'entwined with governmental policies,' or [that] government is 'entwined in [its] management or control.'"

## DEPRIVING PLAINTIFF OF A FEDERAL RIGHT

90. By its terms, Section 1983 can be used to remedy the deprivation of "rights" granted to the plaintiff under the Constitution, federal statutes, and regulations implementing these statutes.

91. In Cort v. Ash, 422 U.S. 66 (1975) the Supreme Court enunciated a four-part test to determine whether Congress intended to imply a right to sue directly under a federal statute.

92. A plaintiff asserting the right is required to show that (1) membership in the class for whose benefit the statute was enacted, (2) evidence of Congress' intent to confer a private remedy, (3) that a right to sue would be consistent with the statutory purpose, and (4) that the cause of action is not one traditionally relegated to the states to a degree that implying a right to sue would be inappropriate.

93. The plaintiff must show that Congress intended to grant both a private right and a private remedy.

94. In the years following Cort, the judiciary became less willing to find rights of action implied directly under a statute, and plaintiffs began turning to Section 1983–the alternative path for enforcing rights created by federal statute.

95. In Maine v. Thiboutot, the Supreme Court held for the first time that Section 1983 could be used to remedy the deprivation of rights created by a federal statute.

96. In Wright v. Roanoke Redevelopment and Housing Authority, the Supreme Court suggested that a regulation promulgated to interpret a federal statute could also be a "law" which could be enforced under Section 1983.

97. The initial three-pronged test for finding a right enforceable under Section 1983 was set forth in Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990).   It asks whether (1) Congress intended the particular statutory provision to benefit the putative plaintiff, (2) the provision is not so vague or amorphous as to make judicial enforcement difficult or impractical, and (3) the statute imposes a binding obligation on the government.  Id.; see also Blessing v. Firestone, 520 U.S. 329 (1997). After these inquiries, a fourth arises: (4) did Congress create a comprehensive mechanism for enforcing the statute which implies that it intended to deny a private right of action under Section 1983.

98. [". . .Subjects or causes to be subjected"]

99. Section 1983 does not impose a state of mind requirement independent of the underlying basis for liability, but there must be a causal connection between the defendant's actions and the harm that results. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-87 (1977).

100.    The U.S. Supreme Court has interpreted this causation element to require that the harm be the result of action on the part of the government entity that implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the result of the entity's custom. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690-691 (1978).

101.    The Supreme Court has rejected the notion that a plaintiff must meet a heightened pleading standard to state a claim against a municipality for an unconstitutional custom or policy. Leatherman v. Tarrant County, 507 U.S. 163 (1993).  There is, however, a heightened pleading standard for individual capacity claims.

102.    [any person to] the deprivation of rights . . ."

103.    Section 1983 is not itself a source of substantive rights, it merely provides a method for the vindication of rights elsewhere conferred in the United States Constitution and Laws.

104.    Therefore, a plaintiff may prevail only if he can demonstrate that he was deprived of rights secured by the United States Constitution or federal statutes. Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979).

105.    The 14th Amendment's Due Process Clause is the most commonly invoked substantive right.

106.    To state a claim for a deprivation of Due Process, a plaintiff must show: (1) that he possessed a constitutionally protected property interest; and (2) that he was deprived of that interest without due process of law.

107.    "shall be liable . . . in an action at law, Suit in equity, or other proper proceeding for redress . . ."

108.    There is no requirement that the plaintiff sue in federal court because state courts have concurrent jurisdiction. Usually, exhaustion of administrative and judicial state remedies is not a prerequisite to a section 1983 action.

## RIPARIAN WATER RIGHTS

109.    Riparian water rights (or simply riparian rights) is a system for allocating water among those who possess land along its path. It has its origins in English common law. Riparian water rights exist in many jurisdictions with a common law heritage, such as states in the eastern United States. (See. "Riparian right | law". Encyclopedia Britannica. Retrieved 31 August 2021.)

GENERAL PRINCIPLE

110.    Under the riparian principle, all landowners whose properties adjoin a body of water have the right to make reasonable use of it as it flows through or over their properties. If there is not enough water to satisfy all users, allotments are generally fixed in proportion to frontage on the water source. These rights cannot be sold or transferred other than with the adjoining land and only in reasonable quantities associated with that land. The water cannot be transferred out of the watershed without due consideration as to the rights of the downstream riparian landowners.

111.    Riparian rights include such things as the right to access for swimming, boating and fishing; the right to wharf out to a point of navigability; the right to erect structures such as docks, piers, and boat lifts; the right to use the water for domestic purposes; the right to accretions caused by water level fluctuations; the right to exclusive use if the waterbody is non-navigable. Riparian rights also depend upon "reasonable use" as it relates to other riparian owners to ensure that the rights of one riparian owner are weighed fairly and equitably with the rights of adjacent riparian owners.

## RIPARIAN FEDERAL RIGHTS

112.    Under riparian law, water is a public good like the air, sunlight, or wildlife. It is not "owned" by the government, state or private individual but is rather included as part of the land over which it falls from the sky or then travels along the surface.

113.    In determining the contours of riparian rights, there is a clear distinction between navigable (public) waters and non-navigable waters. The land below navigable waters is the property of the state, (See. 43 USC § 1311(A).) and subject to all the public land laws and in most states public trust rights.

114.    Navigable waters are treated as public highways with any exclusive riparian right ending at the ordinary high water mark. Like a road, any riparian right is subordinate to the public's right to travel on the river, but any public right is subject to nuisance laws and the police power of the state. It is not an individual right or liberty interest. Because a finding of navigability establishes state versus federal property, navigability for purposes of riverbed title is a federal question determined under federal law. The states retain the power of defining the scope of the public trust over navigable waters. (See. PPL Montana v Montana 132 S.Ct. 1215 (2012).)

115.    A non-navigable stream is synonymous with private property, or jointly-owned property if it serves as a boundary.

116.    The state could choose to divest itself of title to the streambed, but the waters and use of the waters remains subject to the Commerce Clause of the United States Constitution which holds an easement or servitude, benefiting the federal government for the purpose of regulating commerce on navigable bodies of water. (See. Borax Consolidated, Ltd. v. City of Los Angeles, 29 U.S. 10, 56 S. Ct. 23, 80 L.Ed 9 (1935.) )

117.    The reasonable use of the water by a riparian owner is subject to the downstream riparian owners "riparian right" to receive waters undiminished in flow and quality. Federal environmental regulation of non-navigable waters under the Clean Water Act of 1972 is possible, because all surface waters eventually flow to the public ocean. This has been the subject of political controversy, for example over implementation of the Clean Water Rule. (See. "Riparian Rights". Water Education Foundation. Retrieved 31 August 2021.

## STATES INVOLVEMENT

118.    Federal courts have long recognized that state laws establish the extent of the riparian and public right. In the case of navigable waters, title goes to the average low water mark. The Pennsylvania Supreme Court defined it as the "ordinary low water mark, unaffected by drought; that is, the height of the water at ordinary stages." (See. Appeal of York Haven Water & Power Co., 212 Pa. 622, 62 A.97 (1905).)

119.    Land below the low water mark on navigable rivers belongs to the state government in the case of the 13 original states.

120.    Lands between the high and low water marks on navigable rivers are subject to the police powers of the states. (See. United States v. Pennsylvania Salt Mfg. Co., 16 F.2d 476 (E.D. Pa., 1926))

121.    In the case of the original 13 states, upon ratification of the US Constitution, title to these submerged lands remained vested in the several states similar to the public or common roads.

122.    As new lands were acquired by the United States, either by purchase or treaty, title to the highways and the beds of all navigable, or tidal, water bodies became vested in the United States unless they had been validly conveyed into private ownership by the former sovereign. (See. McKnight v. Brodell, 212 F.Supp 45)

123.    During the territorial period, the United States held these titles "in trust" for the benefit of the future states that would be carved out of the territory. (See. McKnight v. Brodell, 212 F.Supp 45)

124.    Each of the states were to come into the Union on an "equal footing" with the original 13 states. Under the equal footing doctrine, territorial states are vested with the same sovereign title rights to navigable submerged lands as the original 13 states. (See. Pollard v. Hagan, 44 U.S. 212, 3 How. 212, 11 L.Ed. 565 (1845)

125.    However, during the territorial period, the United States could convey certain of these lands under the limited circumstances of promoting commerce. (See. Brewer Elliot Oil and Gas Co. v. U S., 260 U.S. 77, 43 S.Ct 60, 67 L.Ed. 140 (1922)

126.    Ownership of lands submerged by navigable waters was resolved by Congress passing the Submerged Lands Act, (See. 43 U.S.C.A. 1301) Which confirmed state title to the beds of all tidal and navigable bodies of water.

127.    While the act conveyed land title to the states, non-navigable stream beds remained treated like dry lands and contiguous to the adjoining estates. Waters subject to the ebb and flow of the tides, even if non-navigable, also passed to the states, but the continued ownership and public use of these tidal/marsh lands are based on state laws.

### RIPARIAN RIGHTS IN FLORIDA

128.    In 1845, Florida was granted statehood and admitted to the Union, and simultaneously was granted title to all lands beneath navigable waters, by virtue of its sovereignty. (See.  Broward v. Mabry, 50 So. 826, 830 (Fla. 1909).

129.    As later codified by the Florida Constitution and Statutes, the Board of Trustees of the Internal Improvement Fund, ("Trustees") holds title to these sovereign submerged lands in trust for the public, known as the public trust doctrine. (See. Hayes v. Bowman, 91 So.2d 795, 800 (Fla. 1957).)

130.    Specifically, Article X, Section 11, of the Florida Constitution states: The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest. (See. Fla. Const. art. X, § 11.)

131.    By subordinating private property interests to the interest of the public as a whole, Florida's public trust doctrine creates a constant tension between private and public interests in sovereign submerged lands. (See. Hayes, 91 So.2d at 799.)

132.    Discussed in detail below, riparian rights have been dealt with extensively by Florida courts and more recently have been codified by the Florida legislature.

## COMMON LAW INTERPRETATION

133.    Riparian rights are "legal rights incident to lands bounded by navigable waters and are derived from the common law as modified by statute." (See Haynes v. Carbonell, 532 So.2d 746, 748 (Fla. 3d DCA 1988).)

134.    Under Florida law, a riparian owner must own to the line of the ordinary high water mark on navigable waters. (See. Save our Beaches, Inc. v. Fla. Dept. of Envtl. Prot., No. 1D05-4086, 2006 WL 1112700, at *8- *9 (Fla. 1st DCA July 3, 2006), rev. g., 937 So.2d 1099 (Table) (Fla. 2006). (defining the ordinary or mean high water line as the intersection of the tidal plane of mean high water and the shore and mean high water means the average height of the high waters over a 19 year period).

135.    A determination of navigability of the adjacent water body is necessary to establish riparian rights. While the term "riparian rights" has been used broadly in Florida cases and statutes to refer to the legal rights of waterfront owners, "riparian" rights refer to owners along rivers and streams, while "littoral" rights apply to waterfront owners along oceans or lakes .(See. Id at 7.)

136.    However, this distinction is ignored in general discussion and the term riparian rights will be used herein to encompass both categories of rights. (See. Id.)

137.    Although riparian rights are recognized as legal property rights, (See. Haynes, 532 So.2d at 748.) They are distinguishable from the classic concept of real property ownership as holding a "bundle of sticks." (See. Levite, Robert, Estate Planning for Private Landowners: The "Bundle of Sticks", available at http://www.umass.edu/nrec/pdf_files/bundle_of_sticks.pdf.)

138.    Under the classic concept, ownership is broken down into distinct and separate rights such as the right to use, lease, or sell the property. However, due to the underlying state ownership of the water bottom limitations such as lawful state regulation in the interest of the public and the authority of Congress to regulate commerce and navigation, (See.  Freed v. Miami Beach Pier Corp., 112 So. 841, 844 (Fla. 1927).) these rights do not necessarily constitute a full bundle of property rights. Consequently, they have been described by Florida courts as qualified rights. (See. Id.)

139.    As early as 1918, the Florida Supreme Court determined in Thiesen v. Gulf, that riparian rights are sufficiently "property" to be subject to the takings clause and consequently can not be taken without just compensation. (See. Thiesen v. Gulf, F. & A. Ry. Co., 78 So. 491, 507 (Fla. 1918). See also Brannon v. Boldt, No. 2D03-4477, 2007 WL 162166, at *5 (Fla. 2d DCA Jan. 24, 2007), rev. g. 956 So.2d 455 (Table) (Fla. 2007) (recognizing the riparian right of access from the water as a property right which may be

regulated by law, but may not be taken without just compensation and due process of law).

140.  More recently in Belvedere v. Dep't of Transp., The Supreme Court affirmed the protected property rights status of riparian rights, holding it to be an unconstitutional taking for the Department of Transportation to condemn a property owner's waterfront land without also compensating the owner for the value of the riparian rights taken. (See. Belvedere Dev. Corp. v. Dep't of Transp., Div. of Admin., 476 So.2d 649, 653 (Fla. 1985).)

## CONVEYANCE AND SEVERANCE

141.  Riparian rights may be severed by bilateral or voluntary agreement, (See. Id. at 652-653.) but severance can not be inferred from a silent deed. (See. Haynes, 532 So.2d at 748.)

142.  The common law interpretation of the alienability of riparian rights provides that riparian rights are transferred with the upland property, unless the parties explicitly agree otherwise. (See. Belvedere Dev. Corp., 476 So.2d at 651.)

143.  This rationale was articulated in Theisen v. Gulf, when the Florida Supreme Court stated that: The fronting of a lot upon a navigable stream or bay often constitutes its chief value and desirability, whether for residence or business purposes. The right of access to the property over the waters, the unobstructed view of the bay, and the enjoyment of the privileges of the waters incident to ownership of the bordering land would not, in many cases, be exchanged for the price of an upland lot in the same vicinity. In many cases, doubtless, the riparian rights incident to the ownership of the land were the principal, if not sole, inducement leading to its purchase. (See. Thiesen, 78 So. at 507.)

144.  Because riparian rights are an essential ingredient in the overall value of the corresponding upland property, Florida Courts have shown reluctance in separating the two, short of full compensation or an express bilateral agreement. (See. Infra at note 26.)

145.  Additionally, the Florida Supreme Court in Belvedere addressed the extent and limit to which riparian rights can be involuntarily separated from upland ownership. (See. Belvedere Dev. Corp., 476 So.2d at 651-652.)

146.  In Belvedere, the Florida Department of Transportation condemned fee simple title to the upland property but attempted, over the Landowner's objection, to reserve the riparian rights to the owner. (See. Id. at 651.)

147.  However, the owners were to be given no easement or right to enter the taken land and even if a dock was to be built, it would have had to be free standing and accessed only by boat. (See.Id.)

148.  The Court held this to constitute a full taking of both the upland property and the attached riparian rights and concluded that, in the absence of an express bilateral agreement, that the two cannot be severed in a condemnation proceeding. (See. Id. at 652.)

149.  Specifically, stating "[a]lthough riparian rights are property, they are unique in character. The source of those rights is not found within the interest itself, but rather they

are found in, and are defined in terms of the riparian uplands. In most cases, therefore, it is not difficult to find that riparian rights are an inherent aspect of upland ownership and are not severable from it." (See. Id.)

## STATUTORY CODIFICATION

150.    The Florida legislature has codified many aspects of the common law riparian rights. (See. Haynes, 532 So.2d at 748.)

151.    Section 253.141, Fla. Stat., states:

152.    Riparian rights are those incidents to land bordering upon navigable waters. They are rights of ingress, egress, boating, bathing, and fishing and such others as may be or have been defined by law. Such rights are not of a proprietary nature. They are rights inuring to the owner of the riparian land but are not owned by him or her. They are appurtenant to and are inseparable from the riparian land. The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian rights may attach. Conveyance of title to or lease of the riparian land entitles the grantee to the riparian rights running therewith whether or not mentioned in the deed or lease of the upland. (See. FLA. STAT. § 253.141 (2021).)

153.    Two notable distinctions exist between the common law and statutory definitions of riparian rights. The statute provides that riparian rights are not of a proprietary nature and are inseparable from the riparian lands. (See. Id.)

154.    While this appears to contradict the common law articulation of riparian rights, in application by Florida courts, these variations have not been interpreted literally. (See. Belvedere Dev. Corp., 476 So.2d at 652-653 (noting that literally interpreting the statutory scope of riparian rights would be inconsistent with the generally accepted property doctrines and contrary to established case law in Florida).)

155.    Thus, courts have defaulted to the common law interpretations. (See. Id.)

156.    Additionally, Section 18-21.004(3)(b), F.A.C. states that "[s]atisfactory evidence of sufficient upland interest is required for activities on sovereignty submerged lands riparian to uplands." (See.  FLA. ADMIN. CODE ANN. R. 18-21.004(3)(c) (2021).)

157.    Additionally, Section 18-21.004(3)(c), F.A.C. states that "[a]ll structures and other activities must be designed and conducted in a manner that will not unreasonably restrict or infringe upon the riparian rights of adjacent upland riparian owners." (See. FLA. ADMIN. CODE ANN. R. 18-21.004(3)(c) (2019).) These requirements essentially mirror the Florida common law.

## COMMON LAW

## SPECIFIC RIGHTS INCLUDED WITHIN RIPARIAN RIGHTS

## SPECIFIC VS. GENERAL RIGHTS

158.    The scope of riparian rights is narrowly defined.(See.Tewksbury v. City of Deerfield Beach, 763 So.2d 1071, 1072 (Fla. 4th DCA 1999).)

159.   Florida common law has broken down the bundle of riparian rights into general and special rights.(See. Brannon, 2007 WL 162166 at *5.)

160.   General rights, which are shared by the public, include the right to navigation, commerce, fishing, bathing and boating.(See. Id.)

161.   By contrast, special rights are rights exclusive to the owner of upland property to use of the adjacent water body. (See. Id.)

162.   The special rights include the right of access from the water to the riparian land, a right to wharf out to navigability, (See. Shore Village Prop. Owners' Ass'n, Inc. v. State of Fla. Dept. of Envtl. Prot., 824 So.2d 208, 211 (Fla. 4th DCA 2002).) the right to take title to the property by accretion and reliction, and, the right to an unobstructed view over the adjoining waters. (See. Brannon, 2007 WL 162166 at *5.)

## RIGHT TO VIEW AND RIGHT TO EGRESS AND INGRESS

163.   Florida common law recognizes that riparian rights specifically include the right to an unobstructed view and the right of ingress to and egress from the water. (See. Hayes, 91 So.2d at 801.)

164.   The seminal case of Hayes v. Bowman sheds light on what is included within the right of an unobstructed view of the adjoining waters. (See. Id. at 801-802.)

165.   Florida common law is unique in its recognition of a right to unobstructed view. (See. Brannon, 2007 WL 162166 at *5.)

166.   The Florida Supreme Court in Hayes held that "[a]n upland owner must in all cases be permitted a direct, unobstructed view of the Channel and as well a direct, unobstructed means of ingress and egress over the foreshore and tidal waters to the Channel." (See. Hayes, 91 So.2d at 801.)

167.   In Freed v. Miami Pier Corp., the Florida Supreme Court clarified that the right to ingress and egress, includes the right to erect wharves, piers, or docks in order to facilitate access to and the use of navigable waters. (See. Freed, 112 So. at 844.)

168.   The Florida Department of Environmental Protection in recognition of potential conflicts among competing rights, has acknowledged that an order of priority has been implied through various Florida court decisions. (See. The Florida Department of Environmental Protection sponsored a study of the effect of shoreline and channel geometry on the division of riparian rights. The conclusions may be accessed at http://www.dep.state.fl.us/lands/surv_map/ripright.html.)

169.   Specifically, the dominant riparian right is usually the near shore right of ingress to and egress from navigable waters, which takes precedence over the right to view and other specific rights. (See. Id.)

## RIGHT TO ACCRETION AND RELICTION

170.   The right to accretion and reliction has consistently been upheld in Florida as a common law riparian right. (See. Ferry Pass Inspectors' & Shippers' Ass'n v. White's

River Inspectors' & Shippers' Ass'n, 48 So. 643, 644-645 (Fla. 1909) (recognizing as early as 1909 the right to accretion and reliction as riparian rights).)

171.    Accretion is the process in which the action of water causes a build-up in riparian land through the gradual accumulation of solid material, whether silt, sand, soil, or sediment, resulting in the creation of new dry land in an area that was previously covered by 5 water. (See. 78 AM. JUR. 2D Waters § 311 (2007).)

172.    Reliction applies to lands that were once covered by waters, but that have since become uncovered by the gradual recession of the waters. (See. FLA. JUR. Public Lands § 72. Where water periodically rises over land and then recedes, for example, that caused by the seasons, there is no reliction. Id.)

173.    Riparian owners have the common law right to receive accretions to their lands, so long as the deposits were not of the riparian owner's own doing. (See.  Bd. of Tr. of the Internal Improvement Fund v. Sand Key Assoc., 512 So.2d 934, 939 (Fla. 1987). See also Ford v. Turner, 142 So.2d 335, 335 (Fla. 2d DCA 1962) (stating "Florida is bordered by water on the east, south and west. The numerous islands or keys are constantly changing by various methods of accretion, alluvion, erosion, reliction and avulsion, giving rise to myriad problems. Public policy demands a definite standard of quieting title to these areas despite the fact that occasionally some hardship may occur.").)

174.    The Florida Supreme Court in Bd. Of Trs. Of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., in recognizing the mean high water line as the dividing line rule between upland ownership and state sovereign land in the context of accretion and relictions stated that "[a]ny other rule would leave riparian owners continually in danger of losing access to water which is often the most valuable feature of their property, and continually vulnerable to harassing litigation challenging the location of the original water lines." (See. Bd. of Tr. of the Internal Improvement Fund v. Medeira Beach Nominee, 272 So.2d 209, 213 (Fla. 2d DCA 1973).)

175.    In Save our Beaches, the First District Court of Appeal held that landowners are entitled to the accretion if caused by the state. (See. Save our Beaches, 2006 WL 1112700 at *8-*9 (holding that notwithstanding riparian owners' right to state caused accretions, the state may deprive the owners of these rights as long as full compensation is paid).

176.    Additionally, the court in Ford v. Turner, held that unless excepted, the title to accretion or reliction to soil passes with the title to the land to which accretions are appurtenant. (See. Ford, 142 So.2d at 340. See also Freed, 112 So. at 893 (awarding a property owner 100 feet of ocean front property as the result of accretion).)

## RIPARIAN RIGHTS OF NON-WATERFRONT OWNERS

177.    Private riparian rights are not limited to owners of direct waterfront properties, but may be held by owners of property which is not directly adjacent to navigable waterways or more generally, by the public at large. (See. Cartish v. Soper, 157 So.2d 150, 155 (Fla. 2d DCA 1963) (Smith, C.J., concurs, White, J., concurs specially) Concurrence 155

(stating that although riparian rights generally attach to the fee, ownership of the fee is not a necessary condition precedent to riparian rights).)

178.    For example, it is common for Developers to reserve riparian rights for non-waterfront property owners within the development. (See. Brannon, 2007 WL 162166 at *1.)

179.    Such reservations are usually created through easements located on the properties of other waterfront owners. (See. Id.)

180.    These easements are a frequent source of conflict since typically, the non waterfront owners must physically cross his neighbor's property to access the water. (See. Id.)

181.    In Cartish v. Soper, a plat indicated that for all lots within a subdivision, "each owner ha[s] an easement of passage for ingress to and egree[sic] from the waters of Boca Ciega Bay." (See. Cartish, 157 So.2d at 152.)

182.    A dispute arose when the fee simple waterfront lot owner planted a hedge across a portion of his property, thus, partially obstructing the reserved access easement to the water. (See. Id.)

183.    The Cartish court, in rejecting the argument that riparian easement rights cannot be created by implication, held that "insofar as riparian rights are necessary to or consistent with the purposes of the easement, they are impliedly granted to appellees and, as a corollary, reserved from the appellant fee owners." (See. Id. at 153-154.)

184.    Thus, the court held that an unobstructed walkway through the easement was included within an "easement of passage for ingress to and egress from the waters." (See. Cartish at 154-155.)

185.    The riparian rights which accompany easements can be created by reservation as opposed to created expressly. (See. Brannon, 2007 WL 162166 at *5.)

186.    The 2007 decision in Brannon v. Boldt, clarified Cartish by defining under similar circumstances, what riparian rights are necessarily implicit to an "easement for ingress and egress" reserved for non-waterfront lot owners. (See. Id. at *1.)

187.    The court held that in the absence of a detailed easement which delineates specific rights, that an easement for ingress to and egress from the water includes the ability to apply for a permit to build a dock, right to cross the property in a reasonable amount of time in order to access any area below the mean high water mark, and the right to cross the property in order to launch a small boat, canoe, or flotation device. (See. Id. at *6-*7.)

188.    However, this type of easement does not imply the right to fish from the shore or to remain on the property for extended periods of time. (See. Id. at *7.)

## RIPARIAN RIGHTS CREATED NON-EXPRESSLY AND THROUGH RESERVATIONS

189.    Riparian rights resulting from deeds are most often created by express grant. (See Haynes, 532 So.2d at 749.)

190.    However, where a deed is unclear, the legal maxim that a deed is to be construed most strongly against the grantor and most beneficially for the party to whom it is made, controls. (See. Id.)

191.    The court in Haynes v. Carbonell, in using this maxim as support, awarded ownership of a 50 foot strip of land to the grantee of the adjacent landlocked parcel, instead of to the grantor. (See. Id. at 747, 749.)

192.    Since the deed stated that it contained all of the property's riparian rights, the court found it unlikely that even though a miscalculation existed as to the footage included in the deed, that this 50 foot strip was impliedly granted to the grantor. (See. Id. at 749.)

193.    Additionally, Florida courts have upheld riparian rights created through reservations. (See. Padgett v. Cent. & S. Control Dist., 178 So.2d 900, 904 (Fla. 2d DCA 1965).)

194.    For instance, in Padgett v. Cent. and S. Florida Flood Control Dist., The Trustees of the Internal Improvement Fund conveyed formerly submerged lands to the Padgetts, subject to the reservation, that the land could be reclaimed for flood control purposes. (See. Id. at 905.)

195.    Thus, the court did not find a violation of the Padgett's riparian rights, when a portion of the granted lands were permanently covered with water as a result of a subsequent flood control project. (See. Id.)

## STATUES
## GENERAL RIGHTS

196.    The Florida legislature has deferred to the common law regarding the general riparian rights granted to riparian landowners in Section 253.141, Fla. Stat., which states that these rights include "the rights of ingress, egress, boating, bathing, and fishing and such others as may have been defined by law." (See. FLA. STAT. § 253.141 (2021).

## EASEMENTS

197.    The District Court decision in Parlato v. Secret Oaks Owners Ass'n., addressed the sufficiency of easements to establish riparian rights under the Florida Administrative Code. (See. Parlato v. Secret Oaks Owners Ass'n., 793 So.2d 1158, 1161 (Fla. 1st DCA 2001).)

198.    In Parlato, all property owners within a subdivision were granted an easement which authorized them to "cross over Lots 10 and 11 and to use any dock now or thereafter located thereon". (See. Id. at 1160.)

199.    However, a dispute arose when the rebuilding of a dock would have resulted in a setback violation of the riparian rights of the two lot owners. (See. Id. at 1162. FLA. ADMIN. CODE ANN. r. 18-21.004(3)(d) (2019) states "All structures and other activities must be set back a minimum of 25 feet from the applicant's riparian rights line. Marginal docks may be set back only 10 feet. There shall be no exceptions to the setbacks unless the applicant's shoreline frontage is less than 65 feet . . .").

200.    The court held that the easement represented sufficient title interest in the uplands to rebuild the dock under rule 18-21.004(3)(b), F.A.C. which states that an "[a]pplication for activities on sovereignty lands riparian to uplands can only be made by and approved for the upland riparian owner, their legally authorized agent or person with sufficient title

interest in uplands for the intended purpose." (See. Id. at 1163 (quoting FLA. ADMIN. CODE ANN. r. 18-21.004(3)(b)) (2019).)

201.   Additionally, the court held that the riparian rights of the owners of Lots 10 and 11 were subordinated to the access and dock easement rights of the subdivision as a whole (See. Id.) , since; the two lot owners purchased the lots subject to and with knowledge of the existence of the easement. (See. Id. Owners of lots 10 and 11 argued that FLA. ADMIN. CODE ANN. r. 18-21.004(3)(a) which states "None of the provisions of this rule shall be implemented in a manner that would unreasonably infringe upon the traditional common law riparian rights of upland property owners adjacent to sovereignty lands" prohibited rebuilding of the dock, since, it would result in a setback violation. Id.)

**ACCRETION AND RELICTION**

202.   Recently, a conflict has arisen between the statutes and common law regarding a riparian owner's entitlement to land bordering the mean high water line, where the shore has been extended seaward as the result of state erosion control projects.

203.   In a recent decision in Save Our Beaches v. Fla. Dep't of Envt'l Prot., the District Court found that portions of Florida's beach restoration program unconstitutionally infringed upon riparian rights. (See. Id. at *9-*1 (finding FLA. STAT. § 161.191 unconstitutional as applied).)

204.   Section 161.191(2), Fla. Stat., states that:

205.   "Once the erosion control line along any segment of the shoreline has been established in accordance with the provisions of ss. 161.141-161.211, the common law shall no longer operate to increase or decrease the proportions of any upland property lying landward of such line, either by accretion or erosion or by any other natural or artificial process, except as provided in s. 161.211(2) and (3)." (See. FLA. STAT. § 161.191(2) (2021).)

206.   The net effect of this statutory provision was to reserve all common law riparian rights to riparian owners, with the exception of the right to have the property directly touch the water and the right to receive accretions and relictions in the event of state erosion control projects. (See. Save our Beaches, 2006 WL 1112700 at *8.)

207.   The court held this provision unconstitutional as applied because the effect was to deprive upland owners of their riparian rights without just compensation, as required by common law. (See. Id. at *10-*11.)

208.   Additionally, the court cited Section 161.141, Fla. Stat., as further support, which states "If an authorized beach restoration, beach nourishment, and erosion control project cannot reasonably be accomplished without the taking of private property, the taking must be made by the requesting authority by eminent domain proceedings." (See. FLA. STAT. § 161.141 (2021).)

209.   The District Court's decision in Save Our Beaches has been appealed to the Florida Supreme Court and a decision is pending.

210.   A similar decision was reached in Bd. of Tr. of the Internal Improvement Trust Fund v. Sand Key Assc. Ltd., where the Florida Supreme Court reviewed Section 161.051, Fla

Stat., (See. Bd. of Tr. of the Internal Improvement Trust Fund v. Sand Key Assoc., Ltd., 512 So.2d 934, 939 (Fla. 1987).) which provides:

211.     Where any person, firm, corporation, county, municipality, township, special district, or any public agency shall construct and install projects when permits have been properly issued, such works and improvements shall be the property of said person, firm, corporation, county, municipality, township, special district, or any public agency where located, and shall thereafter be maintained by and at the expense of said person, firm, corporation, county, municipality, township, special district, or other public agency. No grant under this section shall affect title of the state to any lands below the mean high-water mark, and any additions or accretions to the upland caused by erection of such works or improvement shall remain the property of the state if not previously conveyed. (See. FLA. STAT. § 161.051 (2021).

212.     The Court held that the provision "was intended to codify common law principles and was not intended to deprive unsuspecting waterfront owners of their rights to accretion and reliction caused by artificial improvements for which they were not responsible." (See. Sand Key, 512 So.2d at 939.)

## HOW RIPARIAN LINES ARE ESTABLISHED

### COMMON LAW

213.     The Florida Supreme Court in Hayes v. Bowman addressed the subjective and uncertain nature of locating riparian lines by stating:

214.     Riparian lines do not necessarily extend into the waters according to upland boundaries nor do such rights under all conditions extend at right angles to the shore line. Our own precedents are completely inconsistent with the appellees' view that such rights extend over an area measured by lines at right angles to the Channel. . . . we cannot define the area within which the rights are to be enjoyed with mathematical exactitude . . . we therefore prescribe the rule that in any given case the riparian rights of an upland owner must be preserved over an area as near as practicable in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. In making such equitable distribution' the Court necessarily must give due consideration to the lay of the upland shoreline, the direction of the Channel and the correlative rights of adjoining upland owners. (See Hayes, 91 So.2d at 802.).

### GENERAL METHODS

215.     In Hayes, the Court considered whether an upland owner's riparian rights to view and access to the channel should be exclusive to all interference in an area extending from the property lines directly out into the water body or whether these rights should be measured by drawing a perpendicular line from the channel to the corners of the property. (See.Id. at 798.) Ultimately, the court decided on the latter because this method resulted in neither an obstruction to the view of or access to the channel. (See. Id. at

802. However, obstructions did exist based on an extension of the property lines even though the channel ran parallel to the shore. Id.)

216.   The Hayes decision set the criteria for allocation of riparian rights in future cases. (See.Lee County v. Kiesel, 705 So.2d 1013, 1015 (Fla. 2d DCA 1998).

217.   No firm rule can be laid down as to every situation. (See. Lake Conway Shores Homeowners Ass'n v. Driscoll, 476 So.2d 1306, 1309 (Fla. 5th DCA 1985). See also Lee County, 705 So.2d at 1015 (stating "This rule means that each case necessarily must turn on the factual circumstances there presented and no geometric theorem can be formulated to govern all cases.").)

218.   However, the two general methods of "prolongation of the property line" and direct line from the property to the channel are still in use. (See. Id.) Moreover, determinations of riparian rights are still based on equitable principles. (See. Lake Conway Shores Homeowners Ass'n, 476 So.2d at 1308.)

219.   The goal stated by the Court is to give each owner a "fair and reasonable opportunity of access to the channel" based on outward proportional lines. (See. Id. at 1308-1309.)

## FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION INTERPRETATION

220.   Conflicts still arise today. When the channel is not parallel to shore, when the shoreline is curved, or where no channel exists in the water body, competing methods for allocating riparian rights may yield drastically different results. (See. The Florida Department of Environmental Protection sponsored a study of the effect of shoreline and channel geometry on the division of riparian rights. The conclusions may be accessed at http://www.dep.state.fl.us/lands/surv_map/ripright.html. )

221.   In an effort to provide some guidance to the surveying community, the Florida Department of Environmental Protection ("DEP") surveyed the status of Florida law on the issue and the effect of shoreline and channel geometry on the allocation of riparian rights, and published recommendations to surveyors and practitioners. (See. Id. Initially, it is necessary to distinguish the channel from the line of deep water (line of navigability, or line of navigation). The channel being the officially marked navigation channel and the line of navigability being the distance offshore where the depth of water is sufficient for navigation year round.)

222.   The DEP found that along a straight river without a marked channel, the most accepted method is to construct dividing lines perpendicular with the line of navigability. (See. Id.) Along a river or other water body with a nearby marked navigation channel, most courts will construct perpendiculars with the nearest limit of the channel in lieu of the line of navigability. (See. Id.)

223.   Additionally, the direction of upland property lines is largely ignored when apportioning riparian rights, except when there is only a minor deviation between the property line extension and other methods.(See. Id.)

224.   However, when the shore is irregular, for example with coves or projections into lakes or oceans, most Florida courts apportion the line of navigability to divide docking

rights equally as opposed to using one of the perpendicular methods described above.
(See. Id.)

## STATUES AND REGULATION

225.   Florida statutes are silent on the method of allocating riparian rights. However, DEP
regulations under Section 18-21.004(3)(d) F.A.C., requires minimum setbacks for
structures regardless of how the riparian rights are allocated. (See. FLA. ADMIN. CODE
ANN. r.18-21.004(3)(d) (2021).

226.   The Florida House has recently proposed legislation which will likely facilitate riparian
owners' ingress to and egress from navigable waters, especially in scenarios in which
riparian property water frontage are limited in width, or are of irregular shape. Proposed
House Bill No. 395 Section 1 (17) states that:

227.   Notwithstanding any other provisions of this chapter, any rule adopted by the Board
of Trustees of the Internal Improvement Trust Fund, or any local ordinance or rule, for
upland properties of 55 linear feet or less in width bordering on navigable waters, two
adjacent property owners, upon agreement, may utilize a single dock to be used by both
upland owners provided that the dock runs adjacent and parallel to a seawall and does
not exceed 100 feet in overall length. (See. H.R. 396, 190th Reg. Sess. (Fla. 2007).

228.   The sharing of docks between such properties is seen as a potential means to avoid
scenarios in which insufficient setbacks exist or where it may be challenging to navigate
boats between closely located docks.

## REMEDIES

## GENERAL REMEDIES AND SPECIFICS VS. NON-SPECIFIC INJURIES

229.   A riparian landowner, under Florida common law, has a variety of remedies available
in the event his riparian rights have been violated. The landowner is not limited to
seeking relief from public authorities but may, and often must, file a suit on his own
behalf. (See. Harrell v. Hess Oil & Chem. Corp., 287 So.2d 291, 295 (Fla. 1973).).
Underlying policy concedes that public officials may not have the same degree of
interest in enforcing a private landowner's rights as they might otherwise be in the case
of a violation of riparian rights of the public as a whole. (See.Id.)  Florida statutes are
silent on the issue of remedies, but, Section 253.14, Fla. Stat., states that a riparian
owner may bring injunction suits in equity.(See. FLA. STAT. § 253.14 (2021).)

230.   Suits enforcing riparian rights generally include declaratory judgments, injunctive
relief, suits to quiet title, ejectment, as well as damages. Generally, standing exists upon
a showing that the unlawful use of public waters or the underlying lands works a special
injury to the riparian owner in the use and enjoyment of his riparian land. (See. Ferry
Pass Inspectors' & Shippers' Ass'n, 48 So. at 645.). As set forth in one of the first Florida
cases to articulate special injuries, an example would be "if the defendant in fact so uses

the [navigable] water or the land thereunder including the shore, as to deprive the complainant of all access to the river or to injure the complainant in the use and enjoyment of his riparian land or the business thereon."(See Id. at 646)

231. By contrast, recovery is not typically due to a riparian owner when the injury is of a non special nature. In this situation, the remedy would be with a public official. (See Id. at 645) For example, in Cent. & S. Fla. Flood Control Dist. v. Griffith, the court denied an upland owner's request to enjoin the construction of a water control dam across a canal downstream from the owner's canal front property. (See. Cent. & S. Fla. Flood Control Dist. v. Griffith, 119 So.2d 423, 425 (Fla. 3d DCA 1960).) Even though this dam would prevent the owner from accessing the ocean from the property by boat, the court held the right of navigation to be a right common to the public in general and that "riparian owners acquire no additional rights to navigation other than those shared concurrently with the public." (See Id.) Essentially, the court held that the building of the dam amounted to the deprivation of a right of navigation which would affect the public as a whole and not specifically to this particular upland owner, thus amounting to a non-special injury. (See Id.) However, the court did state that if the construction of the dam caused flooding on the upland owner's property, that this would qualify as a special injury and that the owner would be able to seek damages. (See Id.)

## COUNT I
### (COMMERCE CLAUSE - 42 U.S.C. § 1983)

232. The Plaintiff incorporates each of the above factual allegations as if fully restated here.

233. The Commerce Clause in Article I, Section 8 of the constitution prohibits the city from depriving the plaintiff the use of navigable waters for commerce.

234. Which has a long history and is recognized in the commerce clause of the U.S. Constitution. This creates the federal "navigable servitude" as a property right held by the government for the benefit of the general public.

235. The Plaintiff has fundamental rights protected by the federal Constitution to commercial navigation.

236. The Plaintiff has fundamental rights protected by the federal Constitution to operate his lawful businesses and in his business reputations.

237. The City developed and acted on an official policy to deprive Plaintiff of his constitutionally protected navigational and business rights, as described herein.

238. In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive, and resulting in depriving, Plaintiff of his constitutionally protected navigational and business rights, described herein, constitutes a policy and custom of the City to do so.

239.   In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiff of his constitutionally protected navigational and business rights, as described herein.

240.   There is a direct and causal link between the City's policies and customs against Plaintiff and his constitutional rights being violated. The plan against Plaintiff is a persistent and widespread unconstitutional practice, and the City has full knowledge of such customs, having been approved and supported by the City and its resources. In addition and in the alternative, both through the City's unofficial custom and practice shown through repeated acts of the individual final policy makers for the City, and through a showing of the municipality's deliberate indifference to the constitutional rights of an individual.

241.   The City's policy, pattern, and practice of depriving Plaintiff of his constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including the Ordinance.

242.   The City thereby deprived Plaintiff of his constitutionally protected rights.

243.   The City deprived Plaintiff of his constitutionally protected rights for no legitimate purpose, and for reasons that were and are pretextual and therefore arbitrary and capricious.

244.   Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

245.   The City acted herein under color of state law.

246.   WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy his constitutionally protected rights;

c. entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiff from enjoying his constitutionally protected rights; and

d. granting any other such relief as the Court deems just and proper.

## COUNT II
## (PUBLIC TRUST DOCTRINE- FLORIDA CONSTITUTION)

247.   The Plaintiff incorporates each of the above factual allegations as if fully restated here.

248.   The state of Florida holds all sovereign submerged lands in trust for the benefit of the public under the public trust doctrine. Fla. Const. Art. X (11); Hayes v. Bowman, 91 So. 2d 795, 800 (Fla. 1957).

249.   Because sovereign submerged lands are held in trust for the benefit of the public. The Plaintiff as a member of the public has a right to navigate for commerce.

250.   The Plaintiff has fundamental rights protected by the Florida constitution to commercial navigation.

251.   The Plaintiff has fundamental rights protected by the Florida constitution to operate his lawful businesses and in his business reputations.

252.   The City developed and acted on an official policy to deprive Plaintiff of his constitutionally protected navigational and business rights, as described herein.

253.   In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive, and resulting in depriving, Plaintiff of his constitutionally protected navigational and business rights, described herein, constitutes a policy and custom of the City to do so.

254.   In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiff of his constitutionally protected navigational and business rights, as described herein.

255.   There is a direct and causal link between the City's policies and customs against Plaintiff and his constitutional rights being violated. The plan against Plaintiff is a persistent and widespread unconstitutional practice, and the City has full knowledge of such customs, having been approved and supported by the City and its resources. In addition and in the alternative, both through the City's unofficial custom and practice shown through repeated acts of the individual final policy makers for the City, and through a showing of the municipality's deliberate indifference to the constitutional rights of an individual.

256.   The City's policy, pattern, and practice of depriving Plaintiff of his constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including the Ordinance.

257.   The City thereby deprived Plaintiff of his constitutionally protected rights.

258.   The City deprived Plaintiff of his constitutionally protected rights for no legitimate purpose, and for reasons that were and are pretextual and therefore arbitrary and capricious.

259.   Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

260.   The City acted herein under color of state law.

261.   WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy his constitutionally protected rights;

c. entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiff from enjoying his constitutionally protected rights; and

d. granting any other such relief as the Court deems just and proper.

**COUNT III**

**(PROCEDURAL DUE PROCESS – 42 U.S.C. § 1983)**

262.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

263.   The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

264.   Plaintiff has a liberty and property interest in his private property and business operations.

265.   As described herein, the City deprived Plaintiff of their liberty and property interests, including by: influencing and/ intimidating and or harassing Sea Isle Marina Company to suspend the plaintiff's legitimate client pick up contract. Thereby hampering Plaintiffs business operations, forcing Plaintiff to pick up clients in The Bay. The Bay where the City Intimidated and harassed the Plaintiff with unlawful search and seizures and an unconstitutional city ordinance citation.

266.   As described herein, the City undertook those deprivations of those protected interests without affording Plaintiff notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests.

267.   The City did so by, among other things, failing to follow the procedures set forth in City Code § 2-814, et seq. to allow the businesses to cure any alleged violations and to request a hearing before a special master prior to stripping it of its entitlements.

268.   The City further did so by, among other things, failing to provide a constitutionally adequate process to remedy the deprivations, including because the BORA and PZAB appeals do not address the deprivations at stake here.

269.   The City thereby deprived Plaintiffs of their constitutionally protected rights.

270.   Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

271.   The City acted herein under color of state law.

272.   WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy his constitutionally protected rights;

c. entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiff from enjoying his constitutionally protected rights; and

d. granting any other such relief as the Court deems just and proper.

**COUNT IV**
**(PROCEDURAL DUE PROCESS, FACIAL, QUASI-FACIAL, AS APPLIED CHALLENGES TO ORDINANCE/CODE – 42 U.S.C. § 1983)**

273.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

274.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

275.    Plaintiff has a liberty and property interest in his private property and business operations. Plaintiff is entitled to notice and an opportunity to be heard, both prior to and after any deprivations of those protected interests.

276.    Section 50-157, of the City Code Ordinance 12992, S 2, 5-8-08, was unlawfully used by the City of Miami to deprive the plaintiff of his business rights. The term "city-owned property abutting water" only applies up to the High Tide Line.

277.    The unlawful enactment and/or enforcement of Section 50-157, Ordinance 12992, S 2, 5-8-08, of the City Code as currently in force is therefore facially unconstitutional.

278.    The City acted herein under color of state law.

279.    WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. declaring unconstitutional Section 50-157 of the City Code as currently in force.

b. invalidating and reverting any action or consequence harming Plaintiff due to the unlawful enactment and/or enforcement of Section 50-157 of the City Code as currently in force Ordinance 12992, S 2, 5-8-08;

c. issuing preliminary and permanent injunctive relief to that effect;

d. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest; and

e. granting any other such relief as the Court deems just and proper.

## COUNT V
### (EQUAL PROTECTION, CLASS OF ONE – 42 U.S.C. § 1983)

280.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

281.    The Fourteenth Amendment to the United States Constitution prohibits the City from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

282.    Plaintiff has constitutionally protected rights to equal protection of and under the laws.

283.    As described herein, the City intentionally treated Plaintiff differently from others identically situated. Specifically, the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses is different from, and intentionally discriminatory in comparison to, all other business owners and operators within The Bay area of the City of Miami, who are prima facie identical to Plaintiffs in all relevant respects.

284.    There is no rational basis for such difference in Plaintiff treatment by the City. All bases provided by the City for its different treatment of Plaintiff are pretextual and thus inherently arbitrary and capricious.

285.    In addition and in the alternative, as described herein, the City's animus against Plaintiff is readily obvious in the City's regulatory conduct in respect of and treatment of Plaintiff property and businesses.

286.    The City acted herein under color of state law.

287.    WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the violation of Plaintiff constitutional rights, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy his constitutionally protected rights;

c. entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiff from enjoying his constitutionally protected rights;

d. granting any other such relief as the Court deems just and proper.

## COUNT VI
## (UNLAWFUL SEARCH & SEIZURE – 42 U.S.C. § 1983)

288.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

289.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fourth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "violat[ing]" Plaintiffs' "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and prohibits the City from undertaking any search or seizure (a) without a warrant supported by probable cause and specifying the legitimate nature and purpose of the seizure, or (b) if conducting an administrative inspection of commercial property subject of a statutory regulatory scheme, without a substantial interest in regulating the particular business, the inspection being necessary to further the regulatory scheme, and the statute's inspection program, in view of the certainty and regularity of its application, providing a constitutionally adequate substitute for a warrant.

290.    The City did not obtain a warrant for any search or seizure of Plaintiff properties described herein.

291.    As described herein, the City violated Plaintiff rights to be secure in their persons and property by unlawfully stopping clients and questioning clients requesting Plaintiff to show proof of insurance, proof of fire extinguisher, and City of Miami Occupational license not in conformance with the purposes and procedures of the relevant statutory scheme.

292.    As described herein, the City's searches and seizures of Plaintiff jetski were unreasonable, pretextual, not designed to support and unnecessary for the furtherance of the relevant administrate scheme or purpose, and have been so random and unpredictable to eliminate reasonable procedures and expectations, thereby violating Plaintiff constitutionally protected rights to be secure in his person and property.

293.    The City acted herein under color of state law.

294.    WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the violation of Plaintiff constitutional rights, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction enjoining the City from undertaking unreasonable searches and seizures of Plaintiff property;

c. entering a preliminary and permanent injunction requiring that the City obtain a warrant supported by probable cause, directed to particular property, and supporting the purpose of the statutory scheme, and otherwise requiring the City's compliance with the statutory scheme for inspection; and

d. granting any other such relief as the Court deems just and proper.

## COUNT VII (VIOLATION OF CITY CHARTER)

295.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

296.    The City is organized under, and governed and bound by, the City of Miami Charter ("Charter").

297.    The Charter's Bill of Rights, at Section 52(A)(1), Bill of Rights, at Section 52(A)(1), provides that the "City shall abide by all of [the Charter's] express provisions."

298.    The Charter, at Section 16(a), obligates the City, through its administrative branch headed by the city manager, to enforce all ordinances, including but not limited to the City of Miami Code of Ordinances ("Code").

299.    The City violated the Code by failing to adhere to City Code § 2-814, et seq. as more fully described herein.

300.    The Charter Bill of Rights, at Section 52(C), affords Plaintiffs standing to bring legal actions to enforce the Charter.

301.    WHEREFORE, Plaintiff demand judgment in his favor and against the City:

a. awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the City's violations of the Charter, as well as all pre- and post-judgment interest;

b. entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff as required by the Code and Charter;

c. entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity adverse to Plaintiff and violating the Code and Charter;

d. granting any other such relief as the Court deems just and proper.

## COUNT VIII (TORTIOUS INTERFERENCE)

302.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

303.    Plaintiff had a business relationship with the customers of
SoBe Jet Ski Rental., Miami Marine Construction., Isle Water Taxi., and Watersport USA.

304.    The City knew or should have known about Plaintiff business relationship with the customers of SoBe Jet Ski Rental., Miami Marine Construction., Isle Water Taxi., and Watersport USA.

305.    The City intentionally and unjustifiably interfered with Plaintiff business relationship with the customers of SoBe Jet Ski Rental., Miami Marine Construction., Isle Water Taxi., and Watersport USA., as described herein, including but not limited to in limiting and shutting those businesses' operations.

306.    As a result of the City's intentional and unjustified interference with Plaintiff business relationship with the customers of, SoBe Jet Ski Rental., Miami Marine Construction., Isle Water Taxi., and Watersport USA. Plaintiff suffered damages, including but not limited to direct damages, consequential damages, lost profits, reputational damages, and loss of goodwill.

307.    WHEREFORE, Plaintiff demands judgment in his favor and against the City awarding damages in an amount in excess of $5.5 million, as well as all pre- and post-judgment interest, and any other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

308.    Plaintiff demand a trial by jury on all claims so triable

## CERTIFICATION AND CLOSING

309.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

310.    I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

311.    Plaintiff Gabriel J. Sosa

DATE 03/14/2022

PHONE: (786) 606-3783
ADDRESS: 17906 NW 59 Ave unit 101
Hialeah Florida 33015
EMAIL: miamimarineconstruction@gmail.com